ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
VINCENT Q. KIRBY
Assistant U.S. Attorney
Arizona State Bar No. 006377
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone:  602-514-7500
Email: Vincent.Kirby@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>Benjamin Pena,<br><br>　　　　　　　Defendant. | CR-17-50185-PHX-SPL<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE** |

The government objects to the defendant request for early termination because he has only served approximately 18 months of the 3 years of supervision imposed by the district court in the District of New Jersey and still owes $1,085,101.61 of the original amount of $1,280,000.00 in restitution.

Pena was convicted by a jury of Count One of Indictment No. 09-00585, charging conspiracy to submit false claims, in violation of 18 U.S.C. §§ 371 and 287, and contrary to the provisions of 18 U.S.C. § 371; Counts Two and Three, submission of false claims in violation of 18 U.S.C. § 287; and Counts Five and Six, charging mail fraud in violation of 18 U.S.C. § 134.

The defendant was involved in a nationwide complex scheme to defraud the Federal Communications Commission.  He and many others participated in running up the number of minutes in a telephone system use by deaf or hard of hearing individuals to make telephone calls.  The defendant would submit the "minutes" of phone calls which were actually accumulated by his employees at his direction, to the Federal government for

fraudulent reimbursement.

According to the presentence report:

The American with Disabilities Act ("ADA") requires all telephone common carriers providing voice transmission services to provide Telecommunications Relay Services ("TRS") to enable deaf and hard of hearing individuals the ability to communicate with hearing individuals "in a manner that is functionally equivalent to. . .voice communication services." In 1993, a nationwide TRS program was initiated.

Video Relay Services ("VRS") is a type of TRS that provides for online video translation services to allow individuals with hearing disabilities the means to communicate through the use of interpreters and web camera by contact through a VRS provider, through an audio and video internet connection. The VRS provider employs a Video Interpreter ("VI") who views and interprets signed conversation for the individual with a hearing disability to relay orally to a hearing person. VRS also allows for a hearing person to initiate contact with a hearing disabled individual through a VI.

TRS, including VRS, is funded by fees assessed on all common carriers by the Federal Communications Commission ("FCC"), which are generally included as fees on consumers' telephone bills and deposited into the TRS Fund, which was established by the FCC as the mechanism for collecting and disbursing TRS funds. The National Exchange Carrier Association ("NECA"), headquartered in Whippany, New Jersey, was a non-profit association responsible for administering the TRS funds.

VRS providers are eligible for reimbursement from the TRS fund for legitimate services at the rate of approximately $6.73 per minute, or $403.80 per hour, for the first 50,000 minutes billed in any given month; approximately $6.46 per minute, or $387.60 per hour, for 50,001 through 500,000 minutes billed, and approximately $6.26 per minute, or $375.60 per hour, for all minutes over 500,000.

Through a contract with the FCC, NECA's functions included collecting annual contributions from carriers, receiving claims for reimbursement from VRS providers and making payments on behalf of the FCC to VRS providers certified to make such claims.

VRS providers authorized by the FCC to receive payment for VRS submitted monthly claims along with required back-up documentation to NECA, which then paid the provider out of the TRS fund. NECA required VRS providers to include call detail records for each billed call, including the date, time and duration of the billed calls; and requested providers to submit the originating phone number or IP address, which identifies the computer from which a call is generated, as well as the destination number. VRS call detail records for the month of October 2008, were submitted to NECA by package delivered through the United States Postal Service on November 26, 2008; and VRS call detail records for the month of November 2008, were submitted to NECA by package delivered via UPS Express on January 20, 2009.

Communication Access Center for the Deaf and Hard of Hearing, Incorporated ("CAC") was a certified VRS provider based in Flint, Michigan, which provided VRS through its own call centers and also contracted with outside entities to operate VRS call centers. CAC billed the minutes from contracted call centers to NECA, with the payments for those calls divided between CAC and the contracted call center. In 2008, CAC was paid more than $38.7 million for VRS services purportedly provided by CAC through its contracted call centers.

Viable Communications, Incorporated ("Viable") was a Delaware corporation established in 2005, and headquartered in Rockville, Maryland. Viable both operated call centers and subcontracted the operation of call enters in other places, including: Miami Lakes, Florida; Kendall, Florida; Rockville, Maryland; Towson, Maryland; Baltimore, Maryland; Austin, Texas; New York City, New York; Las Vegas, Nevada; **Phoenix, Arizona**; Colonia, and New Jersey. Viable split the country into call zones so that call centers did not compete with each other. Because Viable was not a certified VRS provider that could bill to NECA directly, on September 20, 2006, Viable signed an agreement with CAC in which CAC agreed to bill NECA for VRS provided by Viable; and for which Viable would receive approximately 90% of NECA reimbursement. In 2008, Viable was responsible for more than half of the VRS minutes billed to NECA by CAC. In their

- 3 -

relationship, CAC kept 20% of the billed minutes and passed 80% to Viable, and CAC additionally repaid 15% of the billable minutes to Viable for the use of Viable's technology platform.

Viable served as the midpoint of a conspiracy to submit false claims to NECA through operation of its own call centers and contracts with independently owned call centers through the generation and submission of illegitimate VRS calls, made by paid callers, submitted to CAC and ultimately, NECA, for payment. These illegitimate VRS calls came to be referred to as "run calls," "rest" calls, "revenue" calls and, simply, "R calls." Through the submission of claims totaling approximately 8.28 million VRS minutes from Viable for the period of between in or about July 2006 through in or about May 2009, the TRS Fund paid out approximately $55 million, and included illegitimate VRS calls made by paid parties.

John T.C. Yeh was Viable's founder, sole shareholder and owner, President and Chief Executive Officer. John Yeh caused Viable to enter into a contract with CAC under which Viable submitted to NECA for reimbursement for VRS calls processed through the Viable network. John Yeh issued Viable checks and held final authority on company decisions.

John Yeh had the capability to watch the Viable network calling queue on his desktop computer. He monitored the queue and commented to Viable employees and contract call centers when calling minutes were down. Numerous coconspirators maintain he encouraged "run" calls, or calls made using VRS where no interpretation was actually happening, assertions that John Yeh deny.

Benjamin Pena became acquainted with Yeh during a 1994 presentation made by Yeh to the RIT Asian Deaf Club, after which they became friends. Pena purportedly provided consultation on VRS and marketing services to John Yeh and Viable through Pena's company, Logistics Software. Through this arrangement, Viable paid Pena approximately $250 per call hour billed by Viable to NECA.

Pena had known Robert Zachary Rubeck from Rochester Institute for Technology,

where they were both students during the 1990s, and from where Rubeck graduated in May 2000, with a Bachelor of Science degree in Information Technology. Rubeck became reacquainted with Pena in 2004, when Pena was operating a deaf travel agency and solicited Rubeck into working informally as webmaster for the travel agency. In part because of Pena, in 2006 Rubeck moved to Phoenix, Arizona from Sacramento, California. Because he possessed seventy (70) VPads, Pena put Rubeck in contact with Karunya Samuels, through whom Rubeck obtained a side position of employment as an installer for Viable in June 2007.   The VPad was proprietary hardware developed by Viable that would permit deaf and hard of hearing individuals to make VRS calls through audio and video connection to an American Sign Language interpreter, who then interpreted back to the deaf or hard of hearing individuals what was being communicated on the other end of the call.

Pena instructed Rubeck to advise customers during VPad installations that they were required to make ten hour of calls per month suing the Viable VPad or the VPadS would be taken back. Pena noted that each VPad cost him $699 and estimated that ten hours of calls would cover the cost of each VPad. Rubeck was paid $70 for each VPad installation. Rubeck told the customers there was no cost to the customer for obtaining the VPad and encouraged the customers to make ten hours of calls per month. Sometime thereafter, Rubeck secured full-time employment as an IT Specialist, Level III, for the State of Arizona.

In or about January 2007, Pena solicited Rubeck, who is deaf, to conduct frequent VRS calls of extended duration, in exchange for $13 to $15 per hour. The purpose of the calls was to maximize reimbursement to Viable from the NECA. Pena required Rubeck to keep records of the start and end times for all calls. Pena instructed Rubeck to generate minutes by calling real time conference calls using only Viable as the VSR provider. Rubeck used webcalls.com to obtain different numbers to call recordings of various lengths and Rubeck was paid based upon the time each call was connected. Pena gave Rubeck the suggestion of calling recordings of companies' quarterly reports. Rubeck was aware that

VIs were required to keep the content of all calls confidential and noted that VIs accepted such calls without complaint. The VIs had the ability to pause some recordings and occasionally did so for up to three hours. Pena warned that calls lasting up to three hours were "obvious" and did not want the government or FBI noting the duration of calls. He preferred the calls vary in length and not be identical. Pena further instructed that Rubeck change his video screen name or host name and to change the IP address by restarting or using different modems on occasions.

In February 2007, Pena solicited Rubeck's wife, Tamara Frankel, who is also deaf, to make VRS calls for Pena in exchange for $15 per hour, in expectation that she would make between thirty to thirty-five hours of VRS calls per week. Because she was not employed, Frankel made calls throughout business hours while Rubeck worked. In 2008, Pena raised Frankel's pay to $17 per hour if she obtained five hundred to seven hundred hours of calls per month. To achieve this, Rubeck and Frankel add a second internet line in their residence. Frankel used a MAC computer and used several screen names to make calls. She did not change IP addresses monthly as instructed by Pena, although she made calls to podcasts and varied the durations of call from one to six hours.

Frankel increased the hours she was making calls from 8:00 a.m. through to midnight or 1:00 a.m. She estimated making between 600 to 700 hours of calls per month by running two lines simultaneously, with one month having exceed 900 hours of calls. Frankel frequently left the calls and used a mirror on her desk to see if a VI was trying to get her attention while she was turned away. She sometimes used a privacy screen operated by remote. The Vis allowed the calls to run or stated they knew she was not listening or paying attention. Pena asked both Rubeck and Frankel to solicit others to make VRS calls, although both denied having done so.

At the end of each month, Rubeck and Frankel calculated their calls and submitted to Pena a spreadsheet documenting the total minutes of calls they made. Pena then forwarded the spreadsheet to Viable, where it was reconciled with Viable's call records. Once the amount of minutes was finalized, Viable provided the money to Pena

approximately two months later, and Pena paid Rubeck and Frankel. Pena advised there was a two month delay between the call and payment because Viable had to submit bills and wait for payment.

On October 30, 2008, a VRS call that lasted approximately 180 minutes was made to a podcast from an IP address associated with Pena, Rubeck and Frankel, and was submitted to NECA for reimbursement on November 14, 2008. On November 3, 2008, a VRS call lasting approximately 133 minutes was made to a podcast from an IP address associated with Pena, Rubeck and Frankel, and was submitted for reimbursement from NECA on December 12, 2008. Frankel estimated that from approximately August through September 2008, she made between 600 to 700 hours of VRS calls per month and was paid a total of between $40,000 to $60,000 for making VSR calls for Pena.

Pena provided Rubeck and Frankel feedback he had obtained from Viable regarding varying the length and duration of calls in order to make them appear more legitimate. Pena met with Rubeck or Frankel monthly at a local Starbuck's coffeehouse and paid Rubeck and Frankel predominantly in cash, which he said was harder to trace, and suggested they refrain from depositing the money into the bank. Twice Pena paid Rubeck and Frankel by check because their calls for the month were extensive and Pena did not want to carry that much cash. The checks were issued in the amounts of $14,437.82 and $5,749.97 and payable to Rubeck's business, Rubeck Tech Consulting. Pena reportedly deducted 18% of their payments for taxes but did not provide any tax documents to them.

In or about the latter part of 2008, Pena told Frankel he learned she had told two VIs she was being paid to make calls and that Frankel could expect a call the following day from someone at Viable. The next day, John Yeh and Alan Abarbanell demanded a face-to-face videophone call with Frankel and asked whether Frankel had exposed Yeh's name during any of her VRS conversations involving VIs. Frankel denied making any disclosures, to which Yeh responded "Thank God."

In July or August 2009, Rubeck had a program on his computer to destroy computer files. Around that time, Pena told Rubeck to ensure all computer files were destroyed in

the event they were notified of an investigation. In September 2009, Pena and Rubeck were contacted by the FBI. Pena thereafter spoke with Rubeck and Frankel and told them to institute new protocols, and suggested they advise the FBI they were making marketing calls, calls for school, financial information or for Pena's business, Deaf Cruises.

Pena instructed Rubeck and Frankel to discontinue making calls in November 2008, because Viable told Pena to terminate the call program, warning the FCC had become more strict and expected the FCC would be investigating Viable in 2009. Pena instructed Rubeck to destroy everything relating to the calls made for Pena and delete all emails and computer files. Pursuant to Pena's instructions, Rubeck destroyed all emails, files and spreadsheets concerning the calls made by Rubeck and Frankel. Through the duration of operations from February 2008 through November 2008, Pena, Rubeck and Frankel submitted to NECA approximately 200,000 VRS call minutes for reimbursement, at a total cost to the TRS Fund of approximately $1,280,000.

Benjamin Pena, Robert Z. Rubeck and Tamara Frankel are jointly and severally responsible for $1,280,000 in restitution, with each other and John Yeh and Joseph Yeh. Pena also obstructed justice by ordering members of his group to destroy records upon learning of the investigation.

The defendant's current supervision began on November 21, 2016, so he is about half way through the term. The government asks the Court to deny early termination, as continued supervision is required to ensure the communities' safety and his adherence to the rules.  The defendant is a major scam artist.  It gives the government pause that the defendant obtained a grant from Google to learn computers and networking. Computers lead the way in providing avenues for fraudulent schemes azdn that should be monitored for a while.  He was also willing to destroy records to avoid prosecution.  Based on the

Great amount of restitution still owing and the nature and size of his underlying criminal offense, he still requires supervision.  The probation officer concurs.

Respectfully submitted this 6th day of July 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*S/Vincent Q. Kirby*
VINCENT Q. KIRBY
Assistant U.S. Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of July, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a copy mailed to Benjamin Pena.


Copy mailed this same date to:

Benjamin Pena
15757 North 90th place
Apt. # 2071
Scottsdale AZ  85260


*s/Julia G. Soza*
U.S. Attorney's Office

- 9 -